MINNESOTA MINING AND MANUFACTURING COMPANY, a corporation, Plaintiff,

v.

PERMACEL-LE PAGE'S INC., a dissolved corporation, Defendant,

and

Johnson & Johnson, a corporation, Defendant-Intervenor.

Civ. A. No. 57 C 1888.

United States District Court
N. D. Illinois, E. D.

Sept. 30, 1963.

Edward A. Haight, Britton A. Davis, Chicago, Ill., Harold J. Kinney, Stanley G. DeLaHunt, St. Paul, Minn., for plaintiff.

Olson, Mecklenburger, von Holst, Pendleton & Neuman, Chicago, Ill., for defendant.

Thorley von Holst, Sidney Neuman, Robert L. Austin, Charles A. Laff, Chicago, Ill., Benton A. Bull, Harold Haidt, New Brunswick, N. J., of counsel.

WILL, District Judge.

This is another action in what has been called "this apparently interminable multi-facet litigation"[1] involving the Oace et al reissue patent No. 23,843[2].

The subject matter of the patent is a stretchable and retractable pressure-sensitive vinyl plastic adhesive tape of high dielectric strength. These qualities make it an excellent insulator which stays tightly and snugly wrapped around splices and wires and which enjoys wide use and commercial success.

The original Oace et al. application was filed January 12, 1946, and issued as patent No. 2,559,990 on July 10, 1951. On July 9, 1952, the reissue application was filed and the reissue patent No. 23,843 was granted June 29, 1954.

Plaintiff's tapes are sold under the brand name "Scotch" plastic electrical tapes No. 33, No. 88, No. 471, etc. Defendant's accused tapes are manufactured for it by Plymouth Rubber Company and sold under the brand name "Permacel" with designations such as P–29, P–295 and P–32 white, which compete directly with plaintiff's Nos. 33, 88 and 471. By stipulation, P–29, P–295 and P–32 white are to be here considered as representative of all of defendant's accused tapes.

As the Court of Appeals for the Fourth Circuit succinctly observed:

"The insulating tape manufactured by the plaintiff under the patent was a great improvement over prior insulating devices and met with much commercial success. The materials which entered into the composition of the new tape were well known. Vinyl resin, plasticizers and pressure-sensitive adhesives were all old. The problem was to plasticize the vinyl resin in the backing member so that the plasticizer would not migrate into the adhesive and impair its cohesive function, and so that portions of the plasticizer would not exude from the surface of the film upon the underlying adhesive layer when the tape was wound in a roll and cause a loss of tack. The inventors overcame these difficulties and produced a strong, stretchable and retractable article that furnished effective insulation in the splicing of electric wires and cables."[3]

Plaintiff contends that since February 21, 1958, defendant's accused tapes have

1. Plymouth Rubber Co. v. Minnesota Mining & Mfg. Co., infra note 2, 203 F.Supp. at 597.

2. Johns-Manville Corp. v. Minnesota Mining & Mfg. Co., 106 U.S.P.Q. 49 (D.Del. 1955); Minnesota Mining & Mfg. Co. v. Sears, Roebuck & Co., 141 F.Supp. 686 (M.D.N.C.1956), rev'd., 243 F.2d 136 (4th Cir.), pet'n. for rehearing denied, 249 F.2d 66 (4th Cir., 1957), cert. denied, 355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415, rehearing denied, 356 U.S. 915, 78 S.Ct. 668, 2 L.Ed.2d 587 (1958); Minnesota Mining & Mfg. Co. v. United States Rubber Co., 178 F.Supp. 385 (M.D.N.C. 1959), modified & aff'd. 279 F.2d 409 (4th Cir., 1960); Minnesota Mining & Mfg. Co. v. Plymouth Rubber Co., 178 F. Supp. 591 (N.D.Ill.1959) (Robson, J.);

Minnesota Mining & Mfg. Co. v. Superior Insulating Tape Co., 124 U.S.P.Q. 31 (E.D.Mo.1959), aff'd. 284 F.2d 478 (8th Cir. 1960); Plymouth Rubber Co. v. Minnesota Mining & Mfg. Co., 185 F.Supp. 716 (D.Mass.1960); Minnesota Mining & Mfg. Co. v. Technical Tape Corp., 200 F.Supp. 753 (N.D.Ill.), aff'd. 309 F.2d 55 (7th Cir., 1962), cert. denied, 372 U.S. 942, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963); Plymouth Rubber Co. v. Minnesota Mining & Mfg. Co., 203 F.Supp. 595 (D.Mass.1962), appeal dismissed in part and modified and aff'd. in part, 321 F.2d 151 (1st Cir. 1963).

3. Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., supra note 2, 243 F.2d at 138.

infringed claims 1, 3, 4, 6, 7, 8 and 9 of the reissue patent. Defendant challenges the validity of the patent and denies infringement.

## A. INFRINGEMENT

Though it may appear to be in inverse logical order, I shall consider first the more difficult question of infringement. I do so because my interpretation of the claims of the patent is not only directly related to the question of infringement but is also relevant to the issue of validity, particularly with respect to the claims added by the reissue patent.

In order to arrive at the correct understanding of the patent, it is necessary to examine the history of the development of the product by the inventors, the specifications set forth in the patent, the proceedings in the Patent Office as reflected by the file wrapper, the language of the allowed claims and, finally, other judicial interpretations thereof.

The laboratory records and the oral testimony of plaintiff's witness, Tierney, establish clearly that the inventors experimented over an extended period of time with a variety of vinyl bases, plasticizers and adhesives in an effort to find a combination which would achieve a permanent equilibrium between the tape backing and the adhesive of a strong, stretchable and retractable plastic tape.

Without discussing the numerous combinations which were tried and failed for one reason or another, it may be noted that no tapes plasticized solely with what are known as liquid plasticizers were acceptable because, regardless of which vinyl base or adhesive was used, the plasticizer migrated causing the adhesive to be soft and pasty.

Similarly, no tapes plasticized solely with what are known as resinous plasticizers were acceptable because, regardless of the vinyl or adhesive used, the adhesive over a relatively short period of time lost its tack or adhesive quality.

Though they had experimented off and on since 1938, and intensively from early in 1944, it was not until late in the latter year that the plaintiff's laboratory technicians approached a combination which in sample experimental quantities gave promise of providing the permanent equilibrium between tape and adhesive necessary for commercial success.

Having failed with each type of plasticizer when used alone, the technicians did the logical thing of combining parts of each until they found a successful formula, a combination of dioctyl phthalate (DOP), a liquid plasticizer, and G–25, a resinous plasticizer manufactured and introduced to the trade a year or two earlier by Rohm and Haas. The ratio between the two elements ranged from equal amounts of each to twice the quantity of resinous plasticizer to liquid.

During the year 1945, plaintiff continued to experiment but, starting in January, made occasional sales and during the year sold an aggregate of $8,000 of such tape. In passing, it may be noted that eight years later, in 1953, its sales of these tapes exceeded $8,000,000.

In January, 1946, reflecting its experimental experience, plaintiff filed a patent application in the names of its researchers, Oace, Snell and Eastwold. In their specifications they related the earlier unsuccessful experiments with liquid or resinous plasticizers alone as follows:

"Films have also been prepared with increased amounts of dioctyl phthalate or the like in an attempt to reduce the stress requirements and improve the elasticity. Thus, a composition consisting of 100 parts of a vinyl chloride polymer and 33 parts of dioctyl phthalate was calendered to a thickness of four mils and coated with a pressure-sensitive adhesive as hereinabove described. While the physical properties of the film were much improved, it was found that this particular adhesive as well as various other pressure-sensitive adhesives rapidly became soft and 'pasty' when in contact with this or other vinyl polymer films containing more than about 20 parts of liquid type plasticizers. The resulting tape, when wound under tension around a splice or bundle of wires,

soon loosened and became ineffective. This tendency was increased with even slight increase in temperature above normal room temperature.

\* \* \* \* \* \*

"While resinous or high molecular weight modifiers such as 'Paraplex G–25' are themselves capable of producing the desired degree of strength, stretch and elasticity in vinyl chloride polymer films, and furthermore are generally classed as 'non-migrating' or 'permanent' type modifiers or plasticizers, it is surprisingly found that these materials do not provide for permanent equilibrium of adhesive and backing as herein defined. Instead, it has been shown that pressure-sensitive adhesives in prolonged contact with highly stretchable and elastic films consisting solely of vinyl polymer and resinous modifier lose a great deal, if not all, of their initial tackiness or pressure-sensitivity. When tape made in this way is unwound from roll form, after a moderate period of storage, and applied to a splice, it does not adhere either to the electrical conductor or to its own backing, and hence is of no value as an insulating and protective coating." [4]

The specifications then explain how the inventors combined the two types of plasticizers to achieve the equilibrium between tape and adhesive necessary to commercial utilization as follows:

"In order to secure permanent equilibrium between backing and adhesive, we employ with the vinyl chloride polymer a combination of modifiers including a substantial but minor amount (not to exceed about 20 parts per 100 parts of the vinyl polymer) of a low molecular weight liquid plasticizer such as dioctyl phthalate, together with a substantially equal or somewhat greater amount of a high molecular weight resinous type plasticizer, the amount of the latter in any event being sufficient, together with the liquid plasticizer, to provide the desired degree of stretch in the final film. 'Paraplex G–25' is a preferred example of a suitable resinous type plasticizer." [5]

As originally filed, the application contained eight claims. One of the primary claims was No. 3, which read as follows:

"A stretchable and elastic pressure-sensitive adhesive tape adapted for use as an electrical insulating tape for wrapping wire and cable splices, comprising a film backing compounded of a vinyl chloride polymer blended with a low molecular weight liquid plasticizer in amount not exceeding about 20 parts per 100 parts of the vinyl chloride polymer and a non-migrating high molecular weight plasticizer imparting additional elasticity, and a water-insoluble and non-corrosive normally tacky and pressure-sensitive adhesive coating firmly united to the film backing, the adhesive coating and backing film being in permanent equilibrium so that the adhesive is stably tacky and eucohesive, and the adhesive tape being stretchable to the extent of at least about 50% at room temperature and being substantially completely retractable from an elongation of 30%."

This claim was rejected by the Examiner on the ground, among others, that describing the plasticizers simply in terms of low or high molecular weights failed to define the plasticizers used. By amendment, a new claim, No. 9, was added describing the plasticizers as "a low molecular weight liquid plasticizer" and "a nonmigrating high molecular weight plasticizer." This amendment also traversed the Examiner's criticism of claim No. 3. The Examiner maintained his position and in a second amendment filed November 10, 1948, all nine of the previous claims were cancelled and new claims

4. Oace et al. reissue patent 23,843 Cols. 2–3.

5. Id. at Col. 3.

were added, two of which, as amended, became claims 1 and 4, the primary claims of the original patent as finally issued.

In support of the application and in distinguishing earlier patents cited by the Examiner, the applicants stressed that what was unique in their invention was "the three-way blend used by the applicants, employing the vinyl chloride polymer, the liquid phthalyl ester, and the alkyd resin, combined together."

As a result of subsequent proceedings and amendments, the descriptions of the two plasticizers were further modified and what had originally been described in claim No. 3 as "a low molecular weight liquid plasticizer" became "a substantially non-volatile liquid phthalyl ester plasticizer" in the claims as allowed. Similarly what originally was defined as a "non-migrating high molecular weight plasticizer" became "a soft, and viscous low-acid number alkyd plasticizer resin."

In the light of all of the foregoing, I conclude that the patent relates to a tape plasticized with a mixture of a substantially non-volatile liquid phthalyl ester and a soft viscous low-acid number alkyd plasticizer resin in the ratios set forth. This conclusion was also reached by the Court of Appeals for the Fourth Circuit in the Sears case, supra note 2, and followed by the First and Eighth Circuits in the Plymouth Rubber Co. and Superior Tape Co. cases, supra note 2, as well as by the District Court in Massachusetts in the Plymouth case and by Judge Robson of this Court in another Plymouth Rubber Co. case, supra note 2.

Judge Robson summarized the holding of the Fourth Circuit as follows:

"The instant patent and controversy revolve around the plasticizer. The Fourth Circuit opinion construes the patent, in essence, to require *two* plasticizers, one liquid and one resinous. In brief, it held Plymouth's product not to infringe because it had but *one* plasticizer, the resinous one, and there could be no infringement of the patent where an essential element of a patent claim was absent in the allegedly infringing product." [6]

The record in the instant case establishes that the accused tapes are plasticized solely with either G–25 or G–40, both resinous plasticizers and in fact the identical plasticizers used in the tapes held non-infringing in the Fourth, First and Eighth Circuit cases, as well as in the Plymouth case in this District.

Since the patent prescribes the use of a combination of liquid and resinous plasticizers and only the latter is used in the accused tapes, it follows that there is no direct infringement.

An important question with respect to infringement still remains. Plaintiff asserts that the doctrine of equivalence applies to the accused tapes. In support thereof it asserts that G–25 and G–40 as now constituted contain both low molecular weight and high molecular weight molecules with the low weight fractions representing about eight parts per 100 parts of vinyl chloride and having a number average molecular weight below 800. This it contends establishes that G–25 and G–40, at present, are the equivalent of the combination of liquid and resinous plasticizers of the patent.

To substantiate this contention, plaintiff presented evidence of experiments conducted by its employee, Bond, and two independent experts, Drs. Mark and Wall, all of whom performed what are known as fractionation tests. In these tests, the adhesive was first removed from samples of the accused tapes so far as possible and the plasticizer then extracted from the tape backing by the use of appropriate solvents. Thereafter, the solvent was removed leaving a liquid which was substantially plasticizer. These extracts were then fractionated, divided into fractions, and the molecular weights of high and low molecular weight fractions were measured by several different methods: the freezing point lowering method, the boiling point elevation method and the vapor-pressure depression

6. Id., 178 F.Supp. at 593.

method. Each of the three experts used slightly different methods and chemicals to remove the adhesive and extract the plasticizer from the backing. In measuring the molecular weight, Dr. Wall employed the freezing point depression method, Dr. Mark both the freezing point depression and boiling point elevation methods, while Mr. Bond used the vapor-pressure depression method. All three methods are recognized as scientifically acceptable for measuring molecular weight.

While the results of their experiments varied somewhat, each secured low molecular weight fractions from accused tape P–29 constituting from eight to nine parts per 100 parts of vinyl chloride resin which had number average molecular weights ranging from 570 to 756. Comparable results were obtained from the other accused tapes. Based on these findings, plaintiff contends that the plasticizers in the accused tapes are the equivalent of the combination of liquid and resinous plasticizers of the Oace et al reissue patent.

In further support of this conclusion, plaintiff presented evidence that liquid plasticizers generally have a molecular weight of less than 1000. The molecular weights of the liquid plasticizers named in the patent are as follows: dioctyl phthalate (DOP), 390; tricresyl phosphate, 368; butyl phthalyl butyl glycollate, 336; and dibutyl phthalate, 278.

The resinous plasticizers, on the other hand, have number average molecular weights in the thousands although, because they are heterogeneous in character, the resinous plasticizers have molecules of widely varying weights. Paraplex G–25, for example, has molecules ranging in molecular weight from as low as 242 up to 50,000 or more.

This illustrates a significant difference between liquid and resinous plasticizers. The former are simple, homogeneous compounds, the molecules of which are monomeric, and each molecule of which has exactly the same weight as every other. So, each molecule of dicotyl phthalate (DOP) has a molecular weight of 390, dibutyl phthalate, 278, etc.

The resinous plasticizers, on the other hand, are complex, heterogeneous chemical compounds, the molecules of which are polymeric, that is, composed of many repeating units or "mers" in varying combinations or chains. These molecules vary greatly in structure and, as previously indicated, in weight. As a result no uniform weight can be determined and their weight is indicated by averages which may be a number average or weight average depending on the method of calculation used.

Plaintiff's experts acknowledge that the low molecular weight fractions which they extracted from the accused tapes are heterogeneous, that is, the molecules are not uniform and have different weights. As might be expected, they are more homogeneous than the total plasticizer but clearly are not similar in molecular structure to the simple liquid plasticizers. The low weight fractions remain polymeric and, therefore, resinous in character.

The question of equivalence has been considered by several of the courts in which tapes plasticized solely with Paraplex G–25 or G–40 have been charged by plaintiff as infringing. In each case, plaintiff contended, as here, that the composition of G–25 had been changed since 1944 and 1945 when plaintiff's technicians found it unacceptable as a sole plasticizer and that in its modern form it is the equivalent of the combination of liquid and resinous plasticizers with which they were successful. On the record here, I do not conclude that plaintiff has demonstrated such a change. There is substantial evidence from representatives of Rohm and Haas, the manufacturer, as well as laboratory tests, including infrared spectra run by plaintiff on samples of G–25 manufactured from 1945 to 1961, all indicating that no change had been made in the manufacturing process or formula since its inception and that no significant difference was apparent in the infrared spectra from 1945 to 1961.

In any event I agree with the prior holdings that any such change would not result in equivalence since, as the Fourth Circuit said, " * * * G–25, although changed to contain a larger quantity of low molecular weights, would nevertheless be a resinous plasticizer and would not be composed partly of a resinous and partly of a liquid plasticizer in accordance with the teaching of the patent." [7]

Plaintiff relies heavily on the decision of Judge Robson in Minnesota Mining & Mfg. Co. v. Technical Tape Corp., supra note 2, and the affirming opinion of the Court of Appeals for this Circuit in that case, supra note 2. Without going into a detailed analysis of the reasoning of those decisions, it should be noted that none of the tapes there involved was plasticized solely with Paraplex G–25 or Paraplex G–40, a fact stressed by plaintiff in that case to distinguish the prior decisions finding no infringement when G–25 or G–40 were the sole plasticizers and a fact carefully pointed out by Judge Robson in his opinion.

Plaintiff also contends that claim 6 of the reissue patent covers the use of a single resinous plasticizer by its description of the plasticizing material as "(b) a substantially non-volatile plasticizing material therefore in an amount within the range of at least ⅓ of the weight of said polymer but in a substantially lesser amount than said polymer and comprising at least a major proportion of a non-migrating viscous plasticizer resin, * * *."

Again I find myself in agreement with the conclusion of the prior decisions rejecting this contention. As the Court of Appeals for the Fourth Circuit said:

> "It is argued that there is infringement of Claims 6, 7, 8 and 9, which are new in the reissue patent, on the ground that they do not call for a liquid plasticizer. But, as pointed out in our original opinion, these claims are vague with respect to the plasticizers to be used, for they merely provide for the use of a plasticizer 'comprising at least a major proportion of non-migrating viscous plasticizer resin.' If these claims are taken to mean that a liquid plasticizer is not used, they are void because not supported by the teachings of the original patent. Not only did the claims of that patent call for a liquid as well as a resinous plasticizer, but the teaching of the specification was that the use of the liquid plasticizer was essential and that the use of a resinous plasticizer alone would not produce satisfactory results. All of the claims of the reissued patent, whether old or new, must be construed in the light of this teaching, and if the added claims are interpreted as excluding the use of a liquid plasticizer, the patent would be enlarged in scope and therefore void. See United States Industrial Chemicals, Inc. v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 678, 62 S.Ct. 839, 844, 86 L.Ed. 1105, where it was said:

>> " 'It is inadmissible to enlarge the scope of the original patent by recourse to expert testimony to the effect that a process described and claimed in the reissue, different from that described and claimed in the original patent, is, because equally efficacious, in substance that claimed originally. If such testimony could tip the scales on the issue of the validity of a reissue, it would always be possible to substitute any new combination of steps or elements or devices for the one originally described and claimed by proving that the omission of any one or more steps would not alter the result.

>> " 'This court has uniformly held that the omission from a reissue patent of one of the steps or elements prescribed in the original, thus broadening the claims to cover a new and different combina-

---

7. Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., supra note 2, 249 F.2d at 67.

tion, renders the reissue void, even though the result attained is the same as that brought about by following the process claimed in the original patent.' " [8]

In this connection, it must be remembered that the patent states specifically that tapes plasticized solely with G–25 are of "no value." In the face of this statement, it is incongruous for plaintiff now to contend that tapes so plasticized infringe the claims of the reissue patent.

One other observation is relevant on the question of infringement. As I have found, the formulae employed by Plymouth in manufacturing the accused tapes P–29 and P–295, and those used by Plymouth in the manufacture of the tapes held non-infringing in the earlier cases, are substantially identical.[9] While there is no issue of res judicata here since Plymouth is not a party to this action and Permacel was not a party to the earlier actions the precedent is very persuasive.

As is apparent, each ground for finding infringement which plaintiff has urged in this case was also presented to the various District and Circuit Courts which have previously considered the application of the Oace et al reissue patent to tapes plasticized solely with Paraplex G–25 or G–40. The final decision in every case has been a finding of no infringement. For the reasons herein stated, I come to the same conclusion.

## B. VALIDITY OF THE PATENT

While the finding of no infringement determines the judgment in this case, the issue of validity has been raised and, I believe, must be resolved. Defendant challenges the Oace et al reissue patent on the grounds of (1) prior art and (2) prior public use and sale. In addition, it contends that claims 6, 7, 8 and 9 added by the reissue patent are invalid because there was no mistake in the issuance of the original patent and that if the reissue claims are construed to read upon

defendant's accused tapes, they define an invention other than and different from that originally patented and are hence invalid.

The validity of the reissue patent in question has necessarily been considered in all the prior cases and has been found valid in each. These prior holdings are, of course, not binding in this case unless it appears that the evidence herein is not substantially different from that presented in the earlier cases.[10] It is apparent from an examination of the findings and opinions in the earlier cases that the defendant here has produced evidence not presented in the previous trials both on the subject of prior art and on the question of first use and sale.

Notwithstanding this additional evidence. I conclude that the Oace et al. reissue patent is valid. The three additional patents, Russell patents Nos. 2,-227,154 and 2,253,137, and the Bateman patent No. 2,241,384, do not deal with a pressure-sensitive vinyl plastic tape, and their teachings would not lead one trained in the art to the product which Oace and his colleagues developed.

The best evidence of the fact that all of the prior patents and publications did not anticipate the instant patent is the length of time during which the industry sought unsuccessfully to develop a pressure-sensitive elastic vinyl insulating tape as well as the extensive efforts of plaintiff's staff before it finally succeeded in doing so.

With respect to the second basis for the charge of invalidity, that the subject matter of the patent was in public use or was sold or on sale in this country by plaintiff more than one year prior to the date of filing the original application for patent on January 12, 1946, the record does not clearly substantiate this contention. While there was undoubtedly some anticipatory sales talk by one or more of plaintiff's salesmen prior to Jan-

8. Id. 249 F.2d at 68.

9. See p. 544, supra.

10. Cf. Aghnides v. Holden, 226 F.2d 949 (7th Cir., 1955); Gold Seal Importers, Inc. v. Westerman-Rosenberg, Inc., 133 F.2d 192 (2d Cir., 1943).

uary 12, 1945, when the first order apparently was taken, and one lot of experimental tape was designated as "o.k." in December, 1944, the record is not so clear as to satisfy beyond a reasonable doubt that the subject matter of the ultimate patent application was in public use or on sale more than one year prior to the application date.[11]

The question of the validity of the reissue claims may be simply determined. In my opinion there is no necessary conflict between the claims of the original patent, as heretofore discussed, and the somewhat ambiguous language of the reissue claims. In any event, I find myself once again in agreement with the Court of Appeals for the Fourth Circuit which said:

> "Little need be said about claim 6 of the reissued patent. It provides for the use of a plasticizer 'comprising at least a major proportion of nonmigrating viscous plasticizer resin'. If this dubious phrase means that only a resinous plasticizer need be used, the claim is invalid because it goes beyond the disclosure of the original patent; if, on the other hand, the phrase means that both liquid and resinous plasticizers are to be used, the claim is not infringed by the defendants." [12]

Since, however, in my interpretation of the primary claims, including claim 6, I find that they cover only a combination of a liquid and a resinous plasticizer in the ratios specified, it is my opinion that claims 6, 7, 8 and 9 properly interpreted are valid.

## C. CONCLUSION

I hold, then, that the Oace et al. reissue patent No. 23,843 is valid but that the accused tapes do not infringe the claims of that patent.

Judgment will be entered for the defendants and costs exclusive of attorneys' fees assessed against plaintiff.

11. Cf. Merrill v. Builders Ornamental Iron Co., 197 F.2d 16, 19 (10th Cir., 1952).

12. Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., supra note 2, 243 F.2d at 144.